UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CALVIN HAYES, SR.                          CIVIL ACTION

VERSUS                                     NUMBER: 05-2782

JO ANNE B. BARNHART,                       SECTION: "I"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability.  (Rec. docs. 15, 18).

Calvin Hayes, Sr., plaintiff herein, filed the subject applications for DIB and SSI benefits on May 16, 2001, alleging an

an inability to work as of March 25, 2000.[1]/ (Tr. pp. 59-63).  In an undated Disability Report which appears in the administrative record below, plaintiff identified lower back pain, arthritis in the knees, plates and screws in the left ankle, having only one eye, chronic back syndrome, and medication side effects in the form of drowsiness and impatience as the conditions resulting in his inability to work.  (Tr. pp. 69-78).

Plaintiff's applications for Social Security benefits were denied at the initial step of the Commissioner's administrative review process on November 13, 2001.  (Tr. pp. 52-56).  Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on October 10, 2002 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 57, 22-39). On November 5, 2002, the ALJ issued a written decision in which he concluded that

---

[1]/ Based on a review of the Administrative Law Judge's ("ALJ") written decision with respect to the benefits applications at issue, it appears that said applications were the sixth set of such applications that plaintiff has filed in his lifetime.  (Tr. p. 14).  As observed by the ALJ, the alleged onset date of March 25, 2000 was one day following another ALJ's unfavorable decision on plaintiff's fifth set of applications for Social Security benefits. (Tr. pp. 14, 40-48). Those prior applications are not now before the Court and plaintiff's entitlement to Social Security benefits for the time period preceding March 25, 2000 is res judicata as between the parties. Califano v. Sanders, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977); Muse v. Sullivan, 925 F.2d 785, 787 n.1 (5th Cir. 1991).

plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 11-20). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.    [t]he ALJ erred by failing to find that plaintiff's condition meets, or at least medically equals, a Listing.

II.   [t]he ALJ erred by failing to take into account plaintiff's combination of impairments.

III.  [t]he ALJ erred by failing to consider the disabling effects of plaintiff's medications.

(Rec. doc. 15, p. 11).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1.    [c]laimant met the disability insured status requirements of the Act on March 25, 2000, the date he stated he became unable to work, and continues to meet them through December 31, 2005.

2.    [c]laimant has not engaged in substantial gainful activity since the alleged onset date of March 25, 2000.

3.    [t]he medical evidence establishes that claimant has polyarthritis, chronic low back pain, degenerative changes in the left ankle and knees, glaucoma and

3

blindness in the right eye, which are "severe" impairments, but that he does not have an impairment or combination of impairments that meets or equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.  [c]laimant's complaints are not substantiated to the extent claimed and are considered credible under the criteria set forth in Social Security Ruling 96-7p and §§404.1529 and 416.929 only to the extent that he suffers from no more than a mild to moderate amount of pain or other subjective symptoms that would not preclude all substantial and gainful activity.

5.  [c]laimant has the residual functional capacity to perform light work where he has the ability to alternate position, where he would never have to climb stairs, ladders or ropes, where he would only occasionally have to use right foot controls, and where there would be no requirement for binocular vision.

6.  [s]uch residual functional capacity would preclude performing claimant's past relevant work as a janitor, floor care worker, parking lot attendant, and truck driver.

7.  [c]laimant is 50 years old. According to the regulations, this constitutes "closely approaching advanced age." He has a 12th grade education. Claimant has no transferable work skills.

8.  [c]onsidering the aforementioned residual functional capacity and claimant's age, education and past relevant work experience, he can perform work as a cashier, light assembler, and production inspector. Such jobs exist in significant numbers in the region where claimant resides or in the national economy.

(Tr. pp. 19-20).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the

Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any

5

substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.   an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.   if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.
>
> 5.   if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must

ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing held on October 10, 2002, plaintiff was fifty years of age, had a high school education, and had past relevant work experience as a janitor, truck driver, and parking attendant. In her opening statement to the ALJ, plaintiff's counsel argued that plaintiff was disabled based on a long history of low back pain radiating into the extremities that had been exacerbated by a gunshot wound he suffered in 1990/1991; blindness in the right eye due to glaucoma which was beginning to effect the left eye as well; polyarthralgia; a fractured ankle in May of 2000 with hardware installation; and, residuals from a workplace accident that occurred in December of 2000 while he was using a floor buffing machine.

7

Plaintiff then took the stand, initially testifying that he had been homeless since his buffing machine accident at work but later stating that he lived alone in a house next door to his aunt's and that he stored food in her refrigerator and used her microwave to prepare meals.  Following his workplace injury, plaintiff had received workers' compensation benefits for three or four months but some of those payments were possibly related to one of two hernia operations he had undergone while still employed. Upon being questioned by the ALJ, plaintiff admitted that he had, in fact, worked subsequent to the administrative hearing that was held on plaintiff's fifth set of applications for Social Security benefits in March of 2000.  In terms of daily activities, plaintiff testified that he took prescribed medication four times per day which caused drowsiness, light-handedness, and a loss of balance, causing plaintiff to lie down six to seven hours per day and to use a cane to ambulate.  Plaintiff slept at night but was unable to say for how long.  He estimated that he could lift objects only weighing three to four pounds and could walk for only one and one-half blocks before becoming tired and experiencing pain through the lower back and into the legs, knees, elbow, and hands.  (Tr. pp. 22-34, 35-36).

Mary Ellen Kelly, a VE, was next to take the stand.  She began by testifying to the exertional and skill demands of plaintiff's

past work as a janitor, truck driver, and parking attendant. The ALJ then posed a hypothetical question to Kelly which assumed an individual of plaintiff's age and educational background who was capable of light level work with an option to alternate sitting, standing, and walking; who was unable to climb stairs, ladders, and ropes; who could only occasionally use right foot controls; and, who had no binocular vision.  In answer thereto, the VE testified that the described individual would be unable to perform any of plaintiff's past relevant work.  However, the profiled individual could function as a cashier, assembler, or production inspector/examiner, with significant numbers of such jobs existing in the state and national economies.  Upon being tendered to plaintiff's counsel for further questioning, the VE testified that the aforementioned jobs could not be performed if the individual described in the hypothetical question had to lie down for six hours during the day.  (Tr. pp. 34-39).

The medical records generated during the relevant time period[2]/ begin with those from the Medical Center of Louisiana at

_____

[2]/ As noted earlier, the relevant time period at issue herein began on March 25, 2000 because plaintiff's entitlement to Social Security benefits was adjudicated to his detriment for the period ending on March 24, 2000 in his fifth set of benefits applications and because the onset date he identified in his current applications was less than one year before the date that he filed the applications.  See 20 C.F.R. §§404.1512(D), 416.912(d).

New Orleans' ("MCLNO") Radiology Department dated May 31, 2000 documenting x-rays taken of plaintiff's left ankle and lumbosacral spine.  The former study was positive for status post open reduction internal fixation of a lateral malleolous fracture with no complicating features and the latter x-rays were normal.  (Tr. pp. 146-147).  Plaintiff next presented himself to MCLNO's Outpatient Department on June 7, 2000 at which time he expressed a need for a "pain shot".  He recalled a ten-year history of back pain which had gotten progressively worse in the past three to four years.  Plaintiff described the pain as shooting in nature and running from the right buttock to the right hip and through the leg in front of the knee to the lateral aspect of the right lower leg. Plaintiff had similar pain on the left but the right side was worse.  His gait was slow and guarded with a forward flexed posture but there was no foot drop and straight leg raising was negative. Forward flexion and extension of the trunk were limited secondary to pain, there was tenderness upon palpation of the paraspinal area, and there was subjective numbness and tingling with pinprick sensation at L5-S1.  The diagnosis was possible lumbar radiculitis. Plaintiff was administered an injection of Depo-Medrol, and was given samples of Vioxx, and was scheduled for additional testing. (Tr. pp. 144-145).

Plaintiff was next seen at the MCLNO Ophthalmology Clinic on

June 23, 2000.  He had no light perception in the right eye and 20/25 vision with best correction in the left eye.  (Tr. p. 143). On July 25, 2000, plaintiff complained of continued chronic back pain, more on the right than the left.   On neurological examination, Plaintiff had +2 deep tendon reflexes, a normal gait, and 4/5 strength.  Plaintiff was referred to the Pain Clinic, was administered an injection of Toradol, and was given a prescription for Flexeril.  (Tr. p. 142).  Plaintiff had an EKG on July 31, 2000 which revealed evidenced of sinus bradycardia and old septal myocardial infarction. (Tr. p. 141).

On August 10, 2000, plaintiff underwent right laproscopic inguinal hernia repair, expressing a desire "... to return to work as soon as possible ...".  Plaintiff tolerated the procedure well, was restricted from heavy lifting for six weeks, and was given a prescription for Percocet.  The Medical Record Case Summary generated by MCLNO contains a notation that plaintiff was employed by Mile High Valet Service at the time.  (Tr. pp. 119-123).  An MRI of plaintiff's lumbar spine performed on August 14, 2000 revealed minimal central disc bulging at L5-S1 and degenerative disc disease.  (Tr. p. 140).  Plaintiff was then seen at the MCLNO Orthopedic Clinic on August 23, 2000 for complaints of continued back pain radiating down the right leg and into the foot with numbness and tingling in that extremity.  On physical examination,

plaintiff had decreased flexion in the lumbar spine, straight leg raising was negative, and sensation was decreased on the lateral aspect of the right leg.  The assessment was chronic low back pain and plaintiff was prescribed Ibuprofen and was again referred to the Pain Clinic.  (Tr. p. 139).  Plaintiff received follow-up care for his hernia repair on August 25, 2000 and had no complaints other than some pain when he had to use the stairs.  (Tr. p. 138).

Plaintiff returned to MCLNO on September 20, 2000 and was assessed with mechanical low back pain with no radicular signs.  He was referred for physical therapy, was continued on Vioxx, and was started on Elavil.  (Tr. p. 137).  Plaintiff still had radiating low back pain on October 17, 2000. Physical therapy had not begun yet and plaintiff was given refills for Toradol and Flexeril.  (Tr. p. 136).  He received a physical therapy low back evaluation on October 30, 2000 and was felt to have fair to good rehabilitation potential and was therefore recommended for home exercises and the use of a stationary bike.  In providing his history, plaintiff advised the therapist that he had not worked as a floor polisher since August of 2000.  (Tr. pp. 133-135).

On November 9, 2000, plaintiff was evaluated by Dr. Christopher Marrero.  Plaintiff complained of a ten-year history of low back pain from a gunshot wound which had not required surgery. Plaintiff's spine was tender to palpation over L-4 and the right

and left paraspinous muscles and flexion was limited to 80% but was otherwise full with pain on extremes.   Motor strength was 5/5, straight leg raising was negative, and sensation was decreased in the left lower extremity.   The assessment was chronic lower back pain and lumbar radiculopathy; Soma was prescribed.  (Tr. p. 159). A recommended MRI performed on November 21, 2000 revealed a minimal broad-based bulge at the L5-S1 intervertebral disc with minimal narrowing of the neural foramina bilaterally.  (Tr. p. 132). Plaintiff returned to Dr. Marrero on November 30, 2000 and his condition was unchanged on that date.   The assessment remained chronic low back pain and lumbar radiculopathy and plaintiff was prescribed physical therapy and Flexeril.  (Tr. p. 158).

Plaintiff was next seen at MCLNO on December 11, 2000 and reported "feeling alright".  He was undergoing physical therapy at the time and he requested a cane as the use of same lessened his pain.   The author of the note observed that plaintiff's gait pattern was a little smoother with the cane.   Physical therapy was to be continued.  (Tr. p. 131).  Plaintiff reported that heat was helpful for his back discomfort on January 3, 2001, particularly during the winter months.  (Id.).   He was continued on with physical therapy and was doing "OK" on January 17, 2001 with decreased pain after taking his medications and with no complications.   Therapy was continued.  (Id.).  Plaintiff's eye

13

problems were monitored by MCLNO on that same day.  (Tr. p. 189).
Plaintiff had no new complaints on January 26, 2001 and reported
continued improvement with his treatment regimen. (Tr. p. 131).  He
failed to keep a scheduled MCLNO appointment on February 9, 2001.
(Tr. p. 130).  A refill on plaintiff's Flexeril was phoned in on
February 28, 2001. (Tr. p. 188).  Additional appointments scheduled
for March 2 and 14, 2001 were not kept.  (Tr. p. 130).

On March 26, 2001, plaintiff was seen at the MCLNO Urology
Department for complaints of erectile dysfunction.  (Tr. p. 186).
He had no new complaints when seen at MCLNO the following day and
was described as "doing alright".  Physical therapy was continued.
(Tr. p. 130).  Plaintiff's condition was essentially unchanged on
April 9, 2001 with decreased pain through the use of moist heat
after physical therapy.  He was discharged from physical therapy at
this time with instructions to continue his exercises and use of
moist heat at home.  (Id.).  On May 9, 2001, plaintiff's visual
acuity was no light perception in the right eye and 20/20 vision in
the left eye.  (Tr. p. 185).

On May 15, 2001, plaintiff presented himself at MCLNO with
complaints of back pain.  In providing his eligibility information
to MCLNO personnel, plaintiff indicated that he worked as a laborer
for Goodwill Industries.  He advised the examiners that he had re-
aggravated his back which he had initially injured on July 27, 2000

while using a buffing machine at work.  Plaintiff reported pain radiating to both lower extremities and he requested pain medication since his supply had been exhausted.  Ultram and Robaxin were prescribed.  (Tr. pp. 165-168).  Plaintiff was followed at the Urology Clinic on July 30, 2001 and reported that his prescribed mediation was helping and that he had no other problems.  (Tr. p. 184).  After apparently missing appointments at the Orthopedic and Pain Clinics, plaintiff returned to MCLNO on August 4, 2001 requesting a refill of his pain medications.  Toradol, Roboxin, and Vioxx were dispensed and plaintiff was counseled on the importance of keeping scheduled appointments.  (Tr. pp. 182-183).  An injection of Decadron was administered on August 9, 2001.  (Tr. pp. 180-181).  Dental care was obtained on August 29, 2001 and over-the-counter Ibuprofen was recommended.  (Tr. p. 179).  On September 4, 2001, plaintiff's eyesight was re-tested and it remained the same.  (Tr. p. 178).  Plaintiff returned to MCLNO on September 17, 2001 and reported an increase in his radiating back pain over the previous three to four days.  Once again, the Emergency Department records reflect that plaintiff was a laborer for Goodwill Industries.  Pain medications were administered and dispensed.  (Tr. pp. 160-164).

On September 27, 2001, plaintiff was consultatively evaluated by Dr. Camalyn Gaines of Internal Medicine Associates of New

Orleans, L.L.C.  Complaints at the time related to the back, left
ankle, knees, and site of plaintiff's gunshot wound.  In providing
his medical history to Dr. Gaines, plaintiff recalled his July 2000
workplace injury and subsequent treatment by Dr. Marrero.
Plaintiff indicated that the course of physical therapy he had gone
through in late 2000 and early 2001 had not helped his condition.
He also reported a five-year history of knee pain which was
gradually getting worse and, overall, his pain had increased in the
past year.  Plaintiff ambulated with a cane occasionally and he
used heat packs for pain control.  Activities such as bending,
stooping, prolonged walking, and sitting aggravated his back but he
admitted that medication and warm soaks did provide some relief.
Plaintiff estimated that he could walk three to four blocks without
stopping, could dress and bathe himself without help, could stand
for only ten minutes at a time, could sit for only fifteen minutes
at a time, and could lift only five pounds.  He did no house or
yard work.

On physical examination, plaintiff had a slow, steady gait
with a mild antalgic pattern on the left.  There was some
tenderness to palpation on the bilateral posterior superior iliac
spine and a positive Gillet's sign on the left indicative of
sacroiliac dysfunction.  The right side was unable to be tested
secondary to pain.  No spasms were present.  Flexion of the lumbar

16

spine was 30 degrees with pain, extension was limited to 10 degrees, lateral extension was 20 degrees bilaterally, and straight leg raising was positive in the supine and sitting positions.  An examination of the knees revealed a positive McMurray's sign on the left with external rotation indicative of meniscal disease.  Strength was 5/5 in the lower extremities except for 4+/5 bilateral great toe extension and sensation was decreased to pin prick over the L4-51 dermatome.  X-rays revealed a degenerative first lumbar disc.  Based on the results of her evaluation, plaintiff was diagnosed with lumbar disc disease with evidence of nerve root compression at L4-5/S1.  There was evidence of mild atrophy in the lower extremities and some sacroiliac joint dysfunction as a result of poor biomechanics contributing to plaintiff's low back pain syndrome.  Plaintiff also had some degenerative disease in the left ankle and meniscal disease in the left knee.  Dr. Gaines opined that plaintiff should avoid activities requiring prolonged sitting, standing, or walking without an opportunity to alternate positions.  Plaintiff was also to avoid activities requiring frequent navigation of stairs, stooping, crouching, crawling, bending, kneeling, or squatting but he was thought to be able to lift thirty to thirty-five pounds without any difficulty.  (Tr. pp. 169-174).

Plaintiff returned to MCLNO on October 13, 2001 with complaints of persistent low back pain.  It was noted that

plaintiff had appointments at the Physical Medicine, Pain, and Orthopedic Clinics.  Toradol was prescribed.  (Tr. p. 176).  He was seen again at MCLNO on October 17, 2001 and was diagnosed with mechanical back pain with mild radicular symptoms not neurogenic in nature and possible secondary gain versus somatization.  Soma was discontinued and plaintiff was prescribed Tylenol #3 and Trazadone. (Tr. p. 175).

On November 9, 2001, Joyce Watson, an Administration examiner, reviewed the medical records then extant and completed a "Residual Functional Capacity Assessment" ("RCFA") form containing her opinions on plaintiff's ability to engage in work-related activities.   There, Ms. Watson reported that plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday with an opportunity to alternate positions at lunch and normal break periods; was limited in using foot controls with the lower extremities; could never use a ladder/rope/scaffolds and could only occasionally perform other postural maneuvers; had no manipulative, communicative, or environmental limitations; and, had no light perception in the right eye but no limitations in the left.  (Tr. pp. 190-197).

The next medical record is dated February 16, 2002 and documents plaintiff's return to MCLNO for follow-up care.   He

complained of low back pain on that date but was not considering surgical intervention. The diagnosis was "chronic lumbalgia" and plaintiff was directed to engage in activities as tolerated. Plaintiff was to continue to be managed a MCLNO's Physical Medicine/Pain Clinic and was to return in four to six months. (Tr. p. 203). He returned to MCLNO on April 25, 2002 to obtain medication refills and for dental problems. (Tr. pp. 198-201). Plaintiff was followed at the Urology Clinic on June 28, 2002 and reported that his prescribed medication was working well. (Tr. p. 202). He was next seen at MCLNO on March 25, 2003 for rhinitis and chronic lumbalgia. Medications were prescribed. (Tr. pp. 215-216).

On April 1, 2003, plaintiff underwent a physical therapy low back evaluation at MCLNO. Medications at the time included Tylenol only. The stated goal was for plaintiff to obtain conditioning in advance of underlying back surgery scheduled for May 22, 2003. Unfortunately, the evaluation was unable to be performed due to severe pain and limitation in functional mobility and physical therapy was thus thought to be of limited benefit at the time. (Tr. pp. 213-214). Plaintiff returned to MCLNO's Out-Patient Department for follow-up care on June 13, 2003 but there is no indication that he had undergone surgery in the interim. (Tr. p. 212). He was seen for monitoring of his back condition, anxiety,

and dental problems on June 17, 2003.  (Tr. pp. 209-211). The final treatment note documents plaintiff's return to MCLNO on June 18, 2003.  He described his pain as a "10" on a scale of 1 to 10 but stated that Tylenol helped.  He also complained of sleeplessness. Plaintiff ambulated with a cane and straight leg raising was positive but deep tendon reflexes were symmetrical.  Range of motion in the lumbar spine was limited secondary to pain.  Tylenol and Trazadone were prescribed.  (Tr. p. 207).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds.  Before turning to those specific challenges, some preliminary comments are in order here. In the typical Social Security case, a claimant's credibility becomes an important consideration when weighing his testimony and subjective complaints of pain and other limitations against the objective findings of medical practitioners and other sources.  See Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n.4). In plaintiff's case, however, his credibility took on even added importance for the following reasons.

As noted by the ALJ, the benefits applications at issue in this litigation are the sixth set of such applications that plaintiff has filed in which he alleged that he was disabled and was thus unable to work.  (Tr. p. 14).  The first benefits

application was filed in 1977 when plaintiff was just twenty-four years of age. (Id.).  Plaintiff's fifth set of applications was filed in the latter part of 1998 and alleged a disability onset date of September 15, 1998 based on back and vision problems, some of the very same impairments that plaintiff cited as disabling in his current applications for benefits. (Tr. p. 43).  At the administrative hearing held on that fifth set of benefits applications, plaintiff admitted that he had been working upwards of thirty-two hours per week as a janitor since 1996 or 1997 despite other testimony that he was extremely limited from an exertional standpoint. (Tr. pp. 45-46).  He also testified that a doctor had advised him to use a cane to walk but could not remember when that recommendation had been made. (Tr. p. 45). Ultimately, on March 24, 2000, the ALJ who considered plaintiff's fifth set of benefits applications found that plaintiff could return to his past work as a janitor or parking lot attendant, a finding that was left undisturbed by the AC.  (Tr. p. 14).  Plaintiff did not judicially challenge the Commissioner's decision that he was not disabled at any time through March 24, 2000.

On May 16, 2001, plaintiff filed his current applications for benefits, alleging an inability to work as of March 25, 2000, the day following the issuance of the ALJ's decision on plaintiff's fifth set of benefits applications.  Yet the record contains

21

various references to the fact that plaintiff was still working subsequent to the alleged onset date.  For example, when plaintiff had right hernia repair on August 10, 2000, he indicated that he was then employed by Mile High Valet Service and that he was anxious to return to work as soon as possible.  When plaintiff underwent a physical therapy low back evaluation on October 30, 2000, he advised the therapist that he had worked as a floor polisher until August of 2000, some months after the alleged disability onset date of March 25, 2000. On December 11, 2000, plaintiff requested a cane from MCLNO personnel, apparently having lost or discontinued use of the cane he testified to using before the ALJ in his fifth set of applications for benefits.  When plaintiff was later seen at MCLNO for back pain on May 15, 2001, he indicated that he was a laborer for Goodwill Industries and related for the first time that he had sustained a workplace injury on July 27, 2000 while using a buffing machine even though no mention was made of that occurrence in any of the medical records that were generated up to that point.  On September 17, 2001, plaintiff reiterated to MCLNO personnel that he was working as a laborer.

Notwithstanding the alleged disability onset date of March 25, 2000, plaintiff admitted at the administrative hearing that he had worked subsequent to the latter date and had sustained a workplace injury in the summer of 2000 while using a buffing machine for

which he received workers' compensation benefits for several months.  Although plaintiff testified to being "homeless" since suffering the on-the-job injury, he later admitted that he lived alone next door to his aunt and that he used her refrigerator and microwave oven to store food and prepare meals.  And while plaintiff testified that he spent six to seven hours during the day in bed due to being drowsy and light-headed from medication side effects, the medical records contain no contemporaneously-recorded complaints in that regard.  To the contrary, at least one of the MCLNO treatment notes indicates that plaintiff was tolerating his prescribed medications well without any complications and that his pain was diminished after taking those medications.  (Tr. p. 131).  On another occasion, MCLNO questioned the possibility of secondary gain.  (Tr. p. 175).  It is against this backdrop and the objective evidence of record that the ALJ evaluated plaintiff's credibility and his subjective complaints of pain and severe physical limitations.  On five previous occasions prior to filing the applications at issue, plaintiff claimed that he was disabled and was thus unable to work, only to subsequently engage in significant work-related activities.  Plaintiff's ability to do so casts substantial doubt on his claim of disability.

In his first challenge to the Commissioner's decision, plaintiff argues that the ALJ erred by failing to find that his

condition met or medically equaled one of those set forth in the Listing of Impairments, more specifically, Listings 1.03 and 1.04.

In his written decision of November 5, 2002, the ALJ found that plaintiff suffered from severe impairments in the form of polyarthritis, chronic low back pain, degenerative changes in the left ankle and knees, and glaucoma and blindness in the right eye. (Tr. p. 20).  The ALJ concluded, however, that plaintiff did "... not have an impairment or combination of impairments that meets or equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4."  (Id.).  The ALJ noted that "[i]n arriving at the finding that claimant's impairments do not meet or equal a listed impairment, <u>particular</u> <u>attention</u> <u>has</u> <u>not</u> <u>been</u> <u>given</u> <u>to</u> §§2.00 (special senses and speech) and <u>1.00</u> (<u>Musculoskeletal</u> <u>system</u>).  The signs and symptoms of claimant's impairments do not reach the level of severity described in these or any other listings."  (Tr. p. 18).  Contrary to plaintiff's present assertion, the ALJ did consider whether plaintiff's impairments satisfied the criteria of Listing 1.00 and its various subsections.  After making his conclusion at step three of the five-step sequential analysis, the ALJ then proceeded to consider whether plaintiff's impairments prevented him from performing his past relevant work or any other work. (Tr. pp. 18-19).  By doing so, the ALJ implicitly found that plaintiff's impairments did not meet the criteria of Sections 1.03

24

and 1.04 of the Listing of Impairments, or any other listing, irrespective of a whether he identified any other listing by number. <u>Hernandez v. Heckler</u>, 704 F.2d 867, 860 (5th Cir. 1983).

Plaintiff argues that his condition satisfied the criteria of Section 1.03 of the Listing of Impairments. That Section provides that an individual will be deemed disabled if he suffers from:

> *[r]econstructive surgery or surgical arthodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur, within 12 months of onset.

The Regulations further define an inability to ambulate effectively as "... an extreme limitation of the ability to walk, i.e., an impairment(s) that interfere very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00(B)(2)(b)(1). "*To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation includes, but are not limited to, the inability to walk without the use of a walker, two crutches or two cases, the inability to walk a block at a reasonable pace on rough

25

or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.00(B)(2)(b)(2).

In his written decision, the ALJ recalled plaintiff's hearing testimony that he had broken his ankle in the 1980's. (Tr. p. 15). The ALJ also noted that x-rays of plaintiff's left ankle taken on March 11, 1999 showed operative reduction internal fixation of a distal fibular fracture that had a trimallecolar ankle infarction but with no complicating features. (Id.). Plaintiff complained of left ankle pain and swelling on December 14, 1999 but the diagnosis was merely polyarthritis. (Tr. p. 16). Within the relevant time period at issue in this litigation, when plaintiff was seen for follow-up care of his right hernia repair on August 25, 2000, he had no complaints except for some abdominal pain when using the stairs. (Tr. p. 138). X-rays taken on May 31, 2000 revealed status post open reduction with internal fixation of a lateral malleolous fracture, again with no complicating features. (Id.). During her consultative evaluation of plaintiff, Dr. Gaines also noted plaintiff's ankle surgery and, by that time, degenerative joint disease with some decreased range of motion, dorsiflexion,

26

and plantar flexion but she nevertheless concluded that plaintiff was still capable of performing a wide range of work-related activities. (Tr. p. 171).

Most importantly, however, while plaintiff undoubtedly underwent ankle surgery in the late 1980's, that obviously did not prevent him from working in the years that followed. Indeed, despite the alleged onset date of March 25, 2000, plaintiff continued working subsequent to that date, ultimately injuring himself while using a floor buffing machine. Plaintiff himself described that job as involving constant walking, standing, and sitting with occasional lifting of fifty pounds and with frequent lifting of twenty-five pounds. (Tr. p. 95). There is no evidence that plaintiff required assistance getting to and from work or anyplace else and his use of a cane has been sporadic, occasional, and not pursuant to a specific prescription. Considering the record as a whole, the ALJ did not err in finding that plaintiff's ankle condition did not result in such extreme functional loss so as to satisfy the criteria of Section 1.03 of the Listing of Impairments.

Plaintiff additionally argues that his back condition satisfied the criteria of Section 1.04(A) of the Listing of Impairments. That section provides that a claimant will be considered disabled if he suffers from:

> *Disorders of the spine* (e.g., herniated nucleus polposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); ...

As evidence of the nerve root compression required by Listing 1.04(A), plaintiff refers the Court to the results of an MRI performed on November 21, 2000 and a subsequent MCLNO treatment note dated May 15, 2001 in which the results of the aforementioned MRI were recounted. As noted earlier, the MRI in question revealed a "[m]inimal broad-based bulge at [the] L5-S1 intervertebral disc level [with] minimal narrowing of [the] neural foramina bilaterally." (Tr. p. 134). The May 15, 2001 MCLNO treatment note merely repeated these findings. (Tr. p. 166). However, neither of those reports contains a specific finding or diagnosis of nerve root compression. See, e.g., Hernandez v. Commissioner of Social Security, 2006 WL 2641827 at *4 (3rd Cir. 2006). While a narrowing of the neural foramen can lead to or result in nerve root compression, the two conditions are not the same. See, e.g.,

28

Corkill v. Hartford Life and Accident Insurance Company, 435 F.Supp.2d 1192, 1193-94 (N.D. Fla. 2005); Hughes-Rehgrig v. Barnhart, 2003 WL 22005027 at *2 (E.D. Penn. 2003).

The Court also recalls that the MCLNO screening paperwork generated on May 15, 2001 indicated that plaintiff was then employed as a laborer and that was the first mention of his July 27, 2000 workplace injury despite the fact that plaintiff had been seen numerous times and had even gone through a course of physical therapy in the interim.  Tellingly, the diagnosis on May 15, 2001 was an exacerbation of low back pain and plaintiff was directed to return to MCLNO if he experienced, inter alia, any trouble with walking.  (Tr. p. 166, 168).  Plaintiff is correct that Dr. Gaines' impression, without performing a separate MRI on her own, was "... lumbar disc disease with evidence of nerve root compression of the left L4-5, S1 nerve root." (Tr. p. 171).  In spite of that assessment, however, Dr. Gaines opined that plaintiff should avoid activities requiring prolonged sitting, standing, or walking only if he was not allowed to alternate portions as well as activities requiring frequent navigation of stairs, stooping, crouching, bending, kneeling, or squatting.  In light of that opinion, the ALJ would later incorporate a sit/stand/walk option into his hypothetical question to the VE.  The ALJ properly considered all of the evidence of record in concluding that

plaintiff did not suffer from an extreme limitation in the ability to walk and that his condition thus did not satisfy the criteria of Section 1.04(A).

In his second challenge to the Commissioner's decision, plaintiff argues that the ALJ erred by failing to consider the combination of his impairments.  Here, again, the Court disagrees.

In his written opinion of November 5, 2002, the ALJ began by recalling the various conditions that were identified by plaintiff as being disabling, i.e., lower back pain, arthritis in the knees, plates and screws in the left ankle, blindness in one eye, chronic back syndrome, and medication side effects.  (Tr. pp. 14-15).  The ALJ then proceeded to methodically summarize all the evidence of record, including the arguments made and testimony adduced at the administrative hearing to the effect that plaintiff was disabled due to the combination of radiating low back pain exacerbated by a gunshot wound in the early 1990's, blindness in the right eye which was now migrating to the left, polyarthralgia, a fractured ankle in the 1980's with hardware installation, and the workplace buffing machine accident in 2000.  (Tr. p. 15).  Although it pre-dated the relevant time period at issue, the ALJ then discussed the medical records documenting plaintiff's testing and treatment for his back, ankle, and dental problems, hypertension, hernia repair, opthalmological difficulties, and even a urinary tract infection.

(Tr. pp. 15-16).  Over the next three pages of his opinion, the ALJ carefully detailed all of the medical evidence that was generated subsequent to the alleged onset date of March 25, 2000 before launching into the five-step sequential evaluation process.  (Tr. pp. 16-18).  There, the ALJ found that plaintiff suffered from "... polyarthritis, chronic low back pain, degenerative changes in the left ankle and knees, [and] glaucoma and blindness in the right eye, which are 'severe' impairments, but that he does not have an impairment or combination of impairments that meets or equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. p. 20)(emphasis added).  Thus, contrary to plaintiff's present assertions, the ALJ did consider the combined effect of his impairments and the limitations resulting therefrom.  This conclusion is buttressed by the fact that the ALJ, in his hypothetical question to the VE, incorporated limitations resulting from plaintiff's back, ankle, knee, and vision problems. (Tr. p. 20).  This claim is without merit.

In his third and final challenge to the Commissioner's decision, plaintiff argues that the ALJ failed to properly consider the side effects from his medications.  Once again, a review of the record does not bear this out.

In summarizing the objective evidence before him, the ALJ noted the absence of any complaints of any medication-related side

effects in plaintiff's medical records.  (Tr. p. 19).  In fact, on at least one occasion, plaintiff reported decreased pain after taking his prescribed medications with no complications.  (Tr. p. 131).  In contrast to that objective evidence, plaintiff testified at the administrative hearing that his medications left him drowsy and light-headed, thus requiring him to spend six to seven hours in bed during the day in addition to the hours he slept at night. Such subjective complaints must be supported by, and not take precedence over, the objective evidence of record.  <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989); <u>Chapparo v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing <u>Jones</u>, 702 F.2d at 621 n. 4).  Because that support is lacking here, and in light of plaintiff's diminished credibility, the ALJ gave plaintiff's subjective complaints the weight that they deserved in denying his applications for Social Security benefits.

<b><u>RECOMMENDATION</u></b>

For the foregoing reasons, it is recommended that the plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served

with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __9th__ day of _____January_____, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

33